Donald J. Kennedy (DK 1859)
Laura Anne Reeds (LR 9681)
Carter Ledyard & Milburn LLP
Two Wall Street
New York, New York 10005-2072
Tel. No. 212-238-8707
Attorneys for Plaintiff
Bryggen Shipping and Trading AS



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

Bryggen Shipping and Trading AS,

                                    Plaintiff,

          - against -

Univen Petroquimica Ltda,

                                    Defendant.

------------------------------------------------------------X

**07 CV 3084**

07 Civ.

ECF CASE

<u>VERIFIED COMPLAINT</u>

Plaintiff Bryggen Shipping and Trading AS ("Bryggen" or "Plaintiff"), by and through its attorneys, Carter Ledyard & Milburn LLP, as and for its Verified Complaint against the Defendant, Univen Petroquimica Ltda, ("Univen" or "Defendant") alleges:

1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 United States Code § 1333.

2.    At all times material to this action, Plaintiff was, and still is, a foreign company duly organized and operating under the laws of the Kingdom of Norway.

3.      Bryggen was, at all material times, the disponent owner of the M/V Stolt Hawk (the "Vessel").

4.      Upon information and belief, Univen was, and still is, a foreign corporation or other business entity organized under, and existing by virtue of foreign laws, with principal place of business in Itupeva, State of Sao Paulo, Brazil.

5.      There was a charter party fixture dated January 18, 2005, between Bryggen and Univen for the carriage of 12,000 M/T of ethanol from Santos, Brazil to India at the freight rate of $75 per M/T which incorporated the contractual provisions of two other documents: the "Asbatankvoy" form and Univen's Rider clauses. (Ex. 1)

6.      The Vessel was nominated to carry the cargo of ethanol and on January 29, 2005, Univen informed Bryggen that it would not ship the 12,000 M/T on the Vessel. (Ex. 2)

7.      Certain disputes arose between the parties arising out of Univen's breach of the charter party for a total sum of $764,250 exclusive of interest, arbitration costs or attorneys fees.

8.      In accordance with Rider Clause 14 of the charter party contract, all disputes which cannot be amicably resolved shall be referred to arbitration in Singapore, with English Arbitration Law to apply.

9.      The Plaintiff commenced arbitration against Univen on or about March 7, 2005.

2

10.    Plaintiff has incurred damages due to Univen's breach of the charter party.

11.    However, Univen has faled and refused to satisfy the amounts due to Plaintiff arising from the breach of the charter party.

12.    Costs and attorneys' fees are routinely awarded to the prevailing party under English Arbitration Law.  As best as can now be estimated, Plaintiff expects to recover the following amounts in arbitration.

| | | |
|---|---|---|
| A. | On the principal claim: | $764,250.00 |
| B. | 3 years compound interest at 6% per annum: | $145,983.30 |
| C. | Attorneys' fees and costs: | $100,000.00 |
| D. | Arbitration Costs: | $ 25,000.00 |
| | **Total** | $1,035,233.30 |

13.    The Defendant Univen cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Univen has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees including, but not limited to, American Express Bank, Bank of America, N.A., Bank of New York, Citibank, N.A., HSBC Bank USA, N.A., JPMorgan Chase Bank, N.A., Wachovia Bank, N.A. and/or Wells Fargo Bank, N.A. which are due and owing to the Defendant.

14.    Bryggen seeks an order from this court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the

Supplemental Rules for Certain Admiralty and Maritime Claims and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia*, any property of Univen held by the aforesaid garnishees for the purpose of obtaining personal jurisdiction over the Defendant, compelling them to arbitrate the claims asserted by Bryggen, and to secure the Plaintiff's claim as described above.

     **WHEREFORE**, Plaintiff prays:

     A.     That process in due form of law issue against the Defendant Univen, citing it to appear and answer under oath all the matters alleged in the Verified Complaint.

     B.     That since the Defendant Univen cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all tangible or intangible property in whatever form or any other funds held by any garnishee, including, but not limited to, American Express Bank, Bank of America, N.A., Bank of New York, Citibank, N.A., HSBC Bank USA, N.A., JPMorgan Chase Bank, N.A., Wachovia Bank, N.A. and/or Wells Fargo Bank, N.A. which are due and owing to the Defendant, in the amount of $1,035,233.30 to secure the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Verified Complaint.

C.    That this Court recognize and confirm any arbitration award or judgment rendered on Plaintiff's claims herein as a Judgment of this Court.

D.    That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof; and

E.    That the Plaintiff has such other, further and different relief as the Court may deem just and proper.

Dated: April 17, 2007
       New York, New York

Carter Ledyard & Milburn LLP
Attorneys for Plaintiff,
Bryggen Shipping and Trading AS

By: _____
    Donald J. Kennedy (DK 1859)
    Laura Anne Reeds (LR 9681)
    Two Wall Street
    New York, New York  10005-2072
    Tel. 212-732-3200
    Fax: 212-732-3232

**ATTORNEY'S VERIFICATION**

STATE OF NEW YORK      )
                         ss.:
COUNTY OF NEW YORK

1.      My name is Donald J. Kennedy.

2.      I am over 18 years of age, of sound mind, capable of making this verification, and fully competent to testify to all matters stated herein.

3.      I am a partner in the firm of Carter Ledyard & Milburn LLP, attorneys for the Plaintiff

4.      I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5.      The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6.      The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7.    I am authorized to make this Verification on behalf of the Plaintiff.

Dated: New York, New York
       April 17, 2007

_____
Donald J. Kennedy

# EXHIBIT 1

**Hans Solberg**

| | |
|---|---|
| From: | brokers@island.com.sg |
| Sent: | 17. januar 2005 20:10 |
| To: | brokers@island.com.sg |
| Subject: | Recap - Mt Bryggen - Santos / WCI |

*6.1*

Attachments:    Q68 - Bryggen.doc; standard rider cls.doc

Q68 -        standard
gen.doc (83k.doc (41

From: I.S.SHIPBROKERS (PTE) LTD
    Tel: +65 5536-1652   Fax: +65 5636-6455
    EMAIL:BROKERS@ISLANDSHIPBROKERS.COM
    Ref:GC2539865
    Date:1/18/05


Bjorn / Gareth


Pleased to recap Clean fixture as folls:-

Charterer : Univen Petroquimica Ltda
Owners    : Bryggen Shipping and Trading
Vessel    : m/t Bryggen, (Ex JO Elm) oos
        (attached q68)

        1st last cgo : refined palm oil
        2nd last cgo : methanol and/or mtbe
        3rd last cgo : ethanol and/or ethyl acetate


For

Part cargo : 12000mts 1grd ind ethanol, 5pct moloo
Laycan    : Feb 05-17, 2005
    (2b narrowed to 7 days 7 days prior to comm of l/can)
Loadport : oap/b Santos, Brazil
Disch port : oap/b Kandla or Mundra or Mumbai, India OR
        oap/b Kandla or Mundra plus Mumbai, India
        (2b declared by 01st feb)
Freight   : USD 75 pmt b/s 1/1
        USD 77 pmt b/s 1/2
- Full freight payable 7 working days after compl of loading
Laytime   : 200/200mtph l/d shinc rev
Demurrage : USD19,000.- pdpr
C/P form  : Asbatankvoy with UOPC


- Owner to agree on Switching of Bills of lading if required.
    Switching on B/L to be done in Singapore.
    Chrtr required to surrend full 1st set(s) original B/Ls to exchange
    for new set(s) of B/Ls.
- Owners option completion/rotation/segregation but in geographical
    rotation
- Y/A rules 1994
- Owners agents both ends
- all brazilian taxes, not limited to frt tax, putax
    and all this other for chrtrs acct.
- Ttl 2.5% comm on FDD to I.S. Shipbroker
- Chrtr's rider cls 1-21 as per attached to be incorporated into this
    C/P with following amendment and deletions

1



**6.2**

Clauses
1.3 - delete 6, insert 12
2.5 - delete
4.1 - delete "including freight tax."
4.2 - delete
5. - delete
8. - first sentence is ok - delete balance
9. - delete 3rd paragraph
10. - delete
12.5- delete 3rd paragraph
In 6th para - delete 45, insert 90
12. - last para, delete 'lay-by berth'
17. - delete as per main terms
End


Trust above in order. Once again, thanks VM yr support.


Brgds
Gareth
I.S. Shipbrokers

Tel 65 65361662
Mobile 65 98309452
Yohoo : gareth_c2000

2

(2)

Association of Ship Brokers
& Agents (U.S.A.), Inc.
October 1977



# TANKER VOYAGE CHARTER PARTY

## PREAMBLE

|  |  |
|---|---|
| Place | Date |

IT IS THIS DAY AGREED between _____

chartered owner/owner (hereinafter called the "Owner") of the _____

SS/MS _____ (hereinafter called the "Vessel")

and _____ (hereinafter called the "Charterer")

that the transportation herein provided for will be performed subject to the terms and conditions of this Charter Party, which includes this Preamble and

Part I and Part II. In the event of a conflict, the provisions of Part I will prevail over those contained in Part II.

## PART I

**A.**  Description and Position of Vessel:

       Deadweight:       tons (2240 lbs.)       Classed:

       Loaded draft of Vessel on assigned summer freeboard       ft.       in. in salt water.

       Capacity for cargo:       tons (of 2240 lbs. each)       % more or less, Vessel's option.

       Coated:    ☐ Yes    ☐ No

       Coiled:    ☐ Yes    ☐ No       Last two cargoes:

       Now:       Expected Ready:

**B.**  Laydays:

       Commencing:       Cancelling:

**C.**  Loading Port(s):

              Charterer's Option

**D.**  Discharging Port(s):

              Charterer's Option

**E.**  Cargo:

              Charterer's Option

**F.**  Freight Rate:              per ton (of 2240 lbs. each).

**G.**  Freight Payable to:       at



120

Total Laytime in Running Hours:

Demurrage per day:

Commission of          % is payable by Owner to

on the actual amount of freight, when and as freight is paid.

The place of General Average and arbitration proceedings to be London/New York (strike out one).

Tovalop: Owner warrants vessel to be a member of TOVALOP scheme and will be so maintained throughout duration of this charter.

Special Provisions:

IN WITNESS WHEREOF, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be executed in duplicate as of ... e day and year first above written.

itness the signature of:

By: _____

itness the signature of:

By: _____

44

1. WARRANTY—VOYAGE—CARGO. The vessel, classed as specified in Part I hereof, and to be so maintained during the currency of this Charter, shall, with all convenient dispatch, proceed as ordered to Loading Port(s) named in accordance with Clause 4 hereof, or so near thereunto as she may safely get (always afloat), and being seaworthy, and having all pipes, pumps and heater coils in good working order, and being in every respect fitted for the voyage, so far as the foregoing conditions can be attained by the exercise of due diligence, perils of the sea and any other cause of whatsoever kind beyond the Owner's and/or Master's control excepted, shall load (always afloat) from the factors of the Charterer a full and complete cargo of petroleum and/or its products in bulk, not exceeding what she can reasonably stow and carry over and above her bunker fuel, consumable stores, boiler feed, culinary and drinking water, and complement and their effects (sufficient space to be left in the tanks to provide for the expansion of the cargo), and being so loaded shall forthwith proceed, as ordered on signing Bills of Lading, direct to the Discharging Port(s), or so near thereunto as she may safely get (always afloat), and deliver said cargo. If heating of the cargo is requested by the Charterer, the Owner shall exercise due diligence to maintain the temperatures requested.

2. FREIGHT. Freight shall be at the rate stipulated in Part I and shall be computed on intake quantity (except deadfreight as per Clause 3) as shown on the Inspector's Certificate of Inspection. Payment of freight shall be made by Charterer without discount upon delivery of cargo at destination, less any disbursements or advances made to the Master or Owner's agents at ports of loading and/or discharge and cost of insurance thereon. No deduction of freight shall be made for water and/or sediment contained in the cargo. The services of the Petroleum Inspector shall be arranged and paid for by the Charterer who shall furnish the Owner with a copy of the Inspector's Certificate.

3. DEADFREIGHT. Should the Charterer fail to supply a full cargo, the Vessel may, at the Master's option, and shall, upon request of the Charterer, proceed on her voyage, provided that the tanks in which cargo is loaded are sufficiently filled to put her in seaworthy condition. In that event, however, deadfreight shall be paid at the rate specified in Part I hereof on the difference between the intake quantity and the quantity the Vessel would have carried if loaded to her minimum permissible freeboard for the voyage.

4. NAMING LOADING AND DISCHARGE PORTS.
(a) The Charterer shall name the loading port or ports at least twenty-four (24) hours prior to the Vessel's readiness to sail from the last previous port of discharge, or from bunkering port for the voyage, or upon signing this Charter if the Vessel has already sailed. However, Charterer shall have the option of ordering the Vessel to the following destinations for wireless orders:

|  | On a voyage to a port or ports in: |
|---|---|
| ST. KITTS | Carribbean or U.S. Gulf loading port(s) |
| PORT SAID | Eastern Mediterranean or Persian Gulf loading port(s) |
|  | (from ports west of Port Said.) |

(b) If lawful and consistent with Part I and with the Bills of Lading, the Charterer shall have the option of nominating a discharging port or ports by radio to the Master on or before the Vessel's arrival at or off the following places:

| Place | On a voyage to a port or ports in: |
|---|---|
| LAND'S END | United Kingdom/Continent (Bordeaux/Hamburg range) |
|  | or Scandinavia (including Denmark) |
| SUEZ | Mediterranean (from Persian Gulf) |
| GIBRALTER | Mediterranean (from Western Hemisphere). |

(c) Any extra expense incurred in connection with any change in loading or discharging ports (so named) shall be paid for by the Charterer and any time thereby lost to the Vessel shall count as used laytime.

5. LAYDAYS. Laytime shall not commence before the date stipulated in Part I, except with the Charterer's sanction. Should the Vessel not be ready to load by 4:00 o'clock P.M. (local time) on the cancelling date stipulated in Part I, the Charterer shall have the option of cancelling this Charter by giving Owner notice of such cancellation within twenty-four (24) hours after such cancellation date; otherwise this Charter to remain in full force and effect.

6. NOTICE OF READINESS. Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i.e., finished mooring when at a sealoading or discharging terminal and all fast when loading or discharging alongside a wharf), whichever first occurs. However, where delay is caused to Vessel getting into berth after giving notice of readiness for any reason over which Charterer has no control, such delay shall not count as used laytime.

7. HOURS FOR LOADING AND DISCHARGING. The number of running hours specified as laytime in Part I shall be permitted the Charterer as laytime for loading and discharging cargo; but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime. If regulations of the Owner or port authorities prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime; if the Charterer, shipper or consignee prohibits loading or discharging at night, time so lost shall count as used laytime. Time consumed by the vessel in moving from loading or discharge port anchorage to her loading or discharge berth, discharging ballast water or slops, will not count as used laytime.

8. DEMURRAGE. Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein specified. If, however, demurrage shall be incurred at ports of loading and/or discharge by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labor or by breakdown of machinery or equipment in or about the plant of the Charterer, supplier, shipper or consignee of the cargo, the rate of demurrage shall be reduced one-half of the amount stated in Part I per running hour or pro rata for part of an hour for demurrage so incurred. The Charterer shall not be liable for any demurrage for delay caused by strike, lockout, stoppage or restraint of labor for Master, officers and crew of the Vessel or tugboat or pilots.

45

5

122

**9. SAFE BERTHING SHIFTING.** The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to next berth, charges for running lines on arrival at and leaving that berth, additional agency charges and expense, customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth. Time consumed on account of shifting shall count as used laytime except as otherwise provided in Clause 15.

**10. PUMPING IN AND OUT.** The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its consignee. If required by Charterer, Vessel after discharging is to clear shore pipe lines of cargo by pumping water through them and time consumed for this purpose shall apply against allowed laytime. The Vessel shall supply her pumps and the necessary power for discharging in all ports, as well as necessary hands. However, should the Vessel be prevented from supplying such power by reason of regulations prohibiting fires on board, the Charterer or consignee shall supply, at its expense, all power necessary for discharging as well as loading, but the Owner shall pay for power supplied to the Vessel for other purposes. If cargo is loaded from lighters, the Vessel shall furnish steam at Charterer's expense for pumping cargo into the Vessel, if requested by the Charterer, providing the Vessel has facilities for generating steam and is permitted to have fires on board. All overtime of officers and crew incurred in loading and/or discharging shall be for account of the Vessel

**11. HOSES: MOORING AT SEA TERMINALS** Hoses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected by the Charterer, or, at the option of the Owner, by the Owner at the Charterer's risk and expense. Laytime shall continue until the hoses have been disconnected. When Vessel loads or discharges at a sea terminal, the Vessel shall be properly equipped at Owner's expense for loading or discharging at such place, including suitable ground tackle, mooring lines and equipment for handling submarine hoses.

**12. DUES—TAXES—WHARFAGE.** The Charterer shall pay all taxes, dues and other charges on the cargo, including but not limited to Customs overtime on the cargo, Venezuelan Habilitation Tax, C.I.M. Taxes at Le Havre and Portuguese Imposto de Comercio Maritime. The Charterer shall also pay all taxes on freight at loading or discharging ports and any unusual taxes, assessments and governmental charges which are not presently in effect but which may be imposed in the future on the Vessel or freight. The Owner shall pay all dues and other charges on the Vessel (whether or not such dues or charges are assessed on the basis of quantity of cargo), including but not limited to French droits-de-quai and Spanish derrames taxes. The Vessel shall be free of charges for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purpose of loading or discharging cargo; however, the Owner shall be responsible for charges for such berth when used solely for Vessel's purposes, such as awaiting Owner's orders, tank cleaning, repairs, etc. before, during or after loading or discharging.

**13. (a). CARGOES EXCLUDED VAPOR PRESSURE.** Cargo shall not be shipped which has a vapor pressure at one hundred degrees Fahrenheit (100°F.) in excess of thirteen and one-half pounds (13.5 lbs.) as determined by the current A.S.T.M. Method (Reid) D-323.

**(b). FLASH POINT.** Cargo having a flash point under one hundred and fifteen degrees Fahrenheit (115°F.) (closed cup) A.S.T.M. Method D-56 shall not be loaded from lighters but this clause shall not restrict the Charterer from loading or topping off Crude Oil from vessels or barges inside or outside the bar at any port or place where bar conditions exist.

**14. (a). ICE.** In case port of loading or discharge should be inaccessible owing to ice, the Vessel shall direct her course according to Master's judgment, notifying by telegraph or radio, if available, the Charterers, shipper or consignee, who is bound to telegraph or radio orders for another port, which is free from ice and where there are facilities for the loading or reception of the cargo in bulk. The whole of the time occupied from the time the Vessel is diverted by reason of the ice until her arrival at an ice-free port of loading or discharge, as the case may be, shall be paid for by the Charterer at the demurrage rate stipulated in Part I.

**(b)** If on account of ice the Master considers it dangerous to enter or remain at any loading or discharging place for fear of the Vessel being frozen in or damaged, the Master shall communicate by telegraph or radio, if available, with the Charterer, shipper or consignee of the cargo, who shall telegraph or radio him in reply, giving orders to proceed to another port as per Clause 14 (a) where there is no danger of ice and where there are the necessary facilities for the loading or reception of the cargo in bulk, or to remain at the original port at their risk, and in either case Charterer to pay for the time that the Vessel may be delayed, at the demurrage rate stipulated in Part I.

**15. TWO OR MORE PORTS COUNTING AS ONE.** To the extent that the freight rate standard of reference specified in Part I F hereof provides for special groupings or combinations of ports or terminals, any two or more ports or terminals within each such grouping or combination shall count as one port for purposes of calculating freight and demurrage only, subject to the following conditions:

**(a)** Charterer shall pay freight at the highest rate payable under Part I F hereof for a voyage between the loading and discharge ports used by Charterer.

**(b)** All charges normally incurred by reason of using more than one berth shall be for Charterer's account as provided in Clause 9 hereof.

**(c)** Time consumed shifting between the ports or terminals within the particular grouping or combination shall not count as used laytime.

**(d)** Time consumed shifting between berths within one of the ports or terminals of the particular grouping or combination shall count as used laytime.

**16. GENERAL CARGO.** The Charterer shall not be permitted to ship any packaged goods or non-liquid bulk cargo of any description; the cargo the Vessel is to load under this Charter is to consist only of liquid bulk cargo as specified in Clause 1.

6

**17. QUARANTINE.** Should the Charterer send the Vessel to any port or place where a quarantine exists, any delay thereby caused to the Vessel shall count as used laytime; but should the quarantine not be declared until the Vessel is on passage to such port, the Charterer shall not be liable for any resulting delay.

(b) **FUMIGATION.** If the Vessel, prior to or after entering upon this Charter, has docked or docks at any wharf which is not rat-free or stegomyia-free, she shall, before proceeding to a rat-free or stegomyia-free wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the Vessel to an infected wharf the Charterer shall bear the expense of fumigation.

**18. CLEANING.** The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's inspector. The Vessel shall not be responsible for any admixture if more than one quality of oil is shipped, nor for leakage, contamination or deterioration in quality of the cargo unless the admixture, leakage, contamination or deterioration results from (a) unseaworthiness existing at the time of loading or at the inception of the voyage which was discoverable by the exercise of due diligence, or (b) error or fault of the servants of the Owner in the loading, care or discharge of the cargo.

**19. GENERAL EXCEPTIONS CLAUSE.** The Vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from:— any act,

neglect, default or barratry of the Master, mariners or other servants of the Owner in the navigation or management of the Vessel; fire, unless caused by the personal design or neglect of the Owner; collision, stranding or peril, danger or accident of the sea or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk, or any other loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or Owner, shipper or consignee of the cargo, their agents or representatives; insufficiency of packing; insufficiency or inadequacy of marks; explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery; unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault or privity of the Owner. And neither the Vessel nor Master or Owner, nor the Charterer, shall, unless otherwise in this Charter expressly provided, be responsible for any loss or damage or delay or failure in performing hereunder, arising or resulting from:—Act of God; act of war; perils of the seas; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; or seizure under legal process provided bond is promptly furnished to release the Vessel or cargo; strike or lockout or stoppage or restraint of labor from whatever cause, either partial or general; or riot or civil commotion.

**20. ISSUANCE AND TERMS OF BILLS OF LADING**

(a) The Master shall, upon request, sign Bills of Lading in the form appearing below for all cargo shipped but without prejudice to the rights of the Owner and Charterer under the terms of this Charter. The Master shall not be required to sign Bills of Lading for any port which, the Vessel cannot enter, remain at and leave in safety and always afloat nor for any blockaded port.

(b) The carriage of cargo under this Charter Party and under all Bills of Lading issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vii) of this clause and such terms shall be incorporated verbatim or be deemed incorporated by the reference in any such Bill of Lading. In such sub-paragraphs and in any Act referred to therein, the word "carrier" shall include the Owner and the Chartered Owner of the Vessel.

(i) CLAUSE PARAMOUNT. This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Acts of the United States, approved April 16, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels, August 1924, then this Bill of Lading shall have effect, subject to the provisions of such Act, ordinance or legislation. The applicable Act, ordinance or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act. If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to that extent but no further.

(ii) JASON CLAUSE. In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owner is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or owners of the cargo shall contribute with the Owner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Owner or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery.

(iii) GENERAL AVERAGE. General Average shall be adjusted, stated and settled according to York/Antwerp Rules 1950 and, as to matters not provided for by those rules, according to the laws and usages at the port of New York or at the port of London, whichever place is specified in Part I of this Charter. If a General Average statement is required, it shall be prepared at such port or place in the United States or United Kingdom, whichever country is specified in Part I of this Charter, as may be selected by the Owner, unless otherwise mutually agreed, by an Adjuster appointed by the Owner and approved by the Charterer. Such Adjuster shall attend to the settlement and the collection of the General Average, subject to customary charges. General Average Agreements and/or security shall be furnished by Owner and/or Charterer, and/or Owner and/or Consignee of cargo, if requested. Any cash deposit being made as security to pay General Average and/or salvage shall be remitted to the Average Adjuster and shall be held by him at his risk in a special account in a duly authorized and licensed bank at the place where the General Average statement is prepared.



122 B

(iv)  BOTH TO BLAME.  If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owner in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder shall indemnify the Owner against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Owner. The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or object are at fault in respect of a collision or contact.

(v)  LIMITATION OF LIABILITY.  Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of, and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force.

(vi)  WAR RISKS.  (a) If any port of loading or of discharge named in this Charter Party or to which the Vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or

(b) If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions or the operation of international law (a) entry to any such port of loading or of discharge or the loading or discharge of cargo at any such port be considered by the Master or Owners in his or their discretion dangerous or prohibited or (b) it be considered by the Master or Owners in his or their discretion dangerous or impossible for the Vessel to reach any such port of loading or discharge— the Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other safe port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of the Charter Party (provided such other port is not blockaded or that entry thereto or loading or discharge of cargo thereat is not in the Master's or Owner's discretion dangerous or prohibited). If in respect of a port of discharge no orders be received from the Charterers within 48 hours after they or their agents have received from the Owners a request for the nomination of a substitute port, the Owners shall then be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment so far as cargo so discharged is concerned. In the event of the cargo being loaded or discharged at any such other port within the respective range of loading or discharging ports established under the provisions of the Charter Party, the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated. In the event, however, that the Vessel discharges the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party, freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and or discharging the cargo thereat shall be paid by the Charterers or Cargo Owners. In the latter event the Owners shall have a lien on the cargo for all such extra expenses.

(c)  The Vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any otherwise whatsoever given by the government of the nations under whose flag the Vessel sails or any other government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations, anything is done or is not done such shall not be deemed a deviation.

If by reason of or in compliance with any such direction or recommendation the Vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading, the Vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally designated or to which the vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such other port of discharge shall be paid by the Charterers and/or Cargo Owners and the Owners shall have a lien on the cargo for freight and all such expenses.

(vii)  DEVIATION CLAUSE.  The Vessel shall have liberty to call at any ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in distress, to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call for fuel at any port or ports in or out of the regular course of the voyage. Any salvage shall be for the sole benefit of the Owner.

21.  LIEN.  The Owner shall have an absolute lien on the cargo for all freight, deadfreight, demurrage and costs, including attorney fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any Bills of Lading covering the same or of any storageman.

22.  AGENTS.  The Owner shall appoint Vessel's agents at all ports.

23.  BREACH.  Damages for breach of this Charter shall include all provable damages, and all costs of suit and attorney fees incurred in any action hereunder.

1226

**24. ARBITRATION.** Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the City of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by service upon any officer of the other, wherever he may be found, of a written notice specifying the name and address of the arbitrator chosen by the first moving party and a brief description of the disputes or differences which such party desires to put to arbitration. If the other party shall not, by notice served upon an officer of the first moving party within twenty days of the service of such first notice, appoint its arbitrator to arbitrate the dispute or differences specified, then the first moving party shall have the right without further notice to appoint a second arbitrator, who shall be a disinterested person with precisely the same force and effect as if said second arbitrator has been appointed by the other party. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court of maritime jurisdiction in the city abovementioned for the appointment of a third arbitrator, and the appointment of such arbitrator by such Judge on such application shall have precisely the same force and effect as if such arbitrator had been appointed by the two arbitrators. Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this Charter for hearing and determination. Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgement may be entered upon any award made hereunder in any Court having jurisdiction in the premises.

**25. SUBLET.** Charterer shall have the right to sublet the Vessel. However, Charterer shall always remain responsible for the fulfillment of this Charter in all its terms and conditions.

**26. OIL POLLUTION CLAUSE.** Owner agrees to participate in Charterer's program covering oil pollution avoidance. Such program prohibits discharge overboard of all oily water, oily ballast or oil in any form of a persistent nature, except under extreme circumstances whereby the safety of the vessel, cargo or life at sea would be imperiled.

Upon notice being given to the Owner that Oil Pollution Avoidance controls are required, the Owner will instruct the Master to retain on board the vessel all oily residues from consolidated tank washings, dirty ballast, etc., in one compartment, after separation of all possible water has taken place. All water separated to be discharged overboard.

If the Charterer requires that demulsifiers shall be used for the separation of oil/water, such demulsifiers shall be obtained by the Owner and paid for by Charterer.

The oil residues will be pumped ashore at the loading or discharging terminal, either as segregated oil, dirty ballast or co-mingled with cargo as it is possible (or Charterers to arrange. If it is necessary to retain the residue on board co-mingled with or segregated from the cargo to be loaded, Charterers shall pay for any deadfreight so incurred.

Should it be determined that the residue is to be co-mingled or segregated on board, the Master shall arrange that the quantity of tank washings be measured in conjunction with cargo suppliers and a note of the quantity measured made in the vessel's ullage record.

The Charterer agrees to pay freight as per the terms of the Charter Party on any consolidated tank washings, dirty ballast, etc., retained on board under Charterer's instructions during the loaded portion of the voyage up to a maximum of 1% of the total deadweight of the vessel that could be legally carried for such voyage. Any extra expenses incurred by the vessel at loading or discharging port in pumping ashore oil residues shall be for Charterer's account, and extra time, if any, consumed for this operation shall count as used laytime.

**BILL OF LADING**

Shipped in apparent good order and condition by _____

on ? the _____ Steamship _____
Motorship

whereof _____ is Master, at the port of _____

_____

_____

_____

_____

to be delivered at the port of _____

or so near thereto as the Vessel can safely get, always afloat, unto _____

or order on payment of freight at the rate of _____

This shipment is carried under and pursuant to the terms of the contract charter dated New York/London _____

between _____ and _____ as

Charterer, and all the terms whatsoever of the said contract charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment.

In witness whereof the Master has signed _____ Bills of Lading

of this tenor and date, one of which being accomplished, the others will be void.

Dated at _____ this _____ day of _____

_____
Master

49



## STANDARD RIDER CLAUSES

### 1. Prior Arrival Load Port

1.1 The Master shall give his ETA to the Owner's agents at the loading and discharge ports 10/7/5/3/2/1 days before arrival indicating the hour approximately at which he expects to arrive. He will also advise the agents as soon as possible of any alterations to this time. The Owner's agents are to pass the foregoing information to the loading and discharge installations immediately.

1.2 Owner's warrant that Vessel is eligible to enter into nominated port(s) and to load and/or discharge port(s) in conformity with laws and regulations of the country concerned.

1.3 ETA
If ETA changes with more than 6 hrs during the last three days of arrival, charterer to be advised of such a change.

### 2. Vessel's Condition

2.1 Vessel to arrive at loading port with tanks free of gas. Gas free certificate and supervision fee by agents to be for Owner's account.

2.2 Vessel to be equipped with full reducers to enable connection to 6-8-10- inch lines.

2.3 Vessel is entered with reputable P and I Club association which is a member of the International Group of P&I Clubs.

2.4 Vessel to be equipped with release valves or vapour return line.

2.5 If Vessel is more than 15 years old, overage insurance premium, if any for Owners account.

### 3. Inspection of the vessel

3.1 The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's inspector. The vessel shall present at load ports with all cargo handling facilities and equipment (including but not limited to tanks, lines, pumps, valves, vents, vent lines, connections, hoses, manifolds, gaskets, etc.) coming into contact with the cargo clean, dry and odor free to the satisfaction of the Charterer's inspectors.

3.2 In the event further cleaning and/or drying of Vessel's cargo handling equipment is necessary after the vessel has berthed, Vessel shall vacate the berth to perform said cleaning and/or drying operations. All cleaning and/or drying and/or shifting to conduct said operations shall be at Owner's risk, time and expense. The Vessel shall not be deemed ready to load within the meaning of ASBATANKVOY Part II, Clause 6, until such time as the Charterer and/or Charterer's inspectors accept the Vessel's cargo systems as clean, dry and odor free.

1

**4. Charges During Loading/Discharge (Wharfage/Dockage)**

4.1 Notwithstanding Clause 12 Part II of ASBATANKVOY Charter Party (dues taxes-wharfage) all charges levied at load and/or discharge ports and described as wharfage and/or dockage and/or harbour dues including fright tax will be for Owner's account.

4.2 Charges levied at loading port(s), even if such charge is assessed in accordance with the quantity of cargo loaded or discharged, will be deemed as a port charge and will be for Owner's account.

**5. Loaded Quantity**

Fixed quantity is always MOLCO, unless otherwise agreed.

In the event that the description of the cargo quantity herein incorporates the wording "percent more in Owner' option", that shall be construed to mean for the purposes of this Charter Party that Charterer's will use best endeavours to provide cargo up to the percent more if so requested by Owner, but that in the event Charterer is unable to satisfy Owner's request for whatever reason, then Charterer is not liable for deadfreight for cargo quantity requested but not provided over and above the fixed quantity to which "the percent more" applies.

**6. Conflict at Loading**

If a conflict arises between terminal orders and Charterer's voyage instructions, Master is to stop cargo operations and to contact Charter at once. Terminal orders shall never supersede Charterer's voyage instructions and any conflict shall be resolved prior to resumption of cargo operations. Vessel is not to resume cargo operations until Charterer has directed vessel to do so.

**7. First Foot**

At the nominated load port(s) where "first foot" quantities are loaded into Vessel(s) cargo tank(s) prior to the loading of the main bulk cargo, the following shall apply:

Where first foots are found to be contaminated, or are not accepted by Charterer's inspector for whatever reason, then such first foots shall be retained on board the Vessel in vessel's slop tanks. Such quantities shall not be counted as cargo loaded under the terms of this Charter Party and Owner will pay for the contaminated cargo. If the presence of contaminated or rejected first foots on board the Vessel results in the Vessel being unable to accommodate Charterer's full cargo as fixed under this Charter Party, then Charterer will not be liable for deadfreight thus incurred. This procedure will apply for first foots and for any other quantity of cargo pumped aboard the Vessel for whatever reasons or purpose prior to the acceptance of cargo tanks by Charterer's inspector.

**8. Cargo Loss**

Owner shall not be liable for any loss of cargo equal to or less than 0.50 percent based on the quantities calculated on board by vessel's ullages at load port and discharging port (if more than one discharge port calculation at any intermediate discharging port will be made both before and after partial discharging). Owner shall reimburse Charterer for losses proven as

2



above, but only for the quantities in excess of the fixed franchise of 0.50 percent or for proven damages to the cargo up to a maximum amount of the CIF value of the cargo itself at the discharging port as documented by Charterer or the market value at the discharging port if no CIF value exists, unless such losses or damages are excused under the provisions of Clause 19 or Part II of this Charter Party or any other Clauses.

## 9. Cargo Handling During Voyage

At no time during the voyage shall Charterer's cargo be transferred between vessel's tanks without the express consent of Charterer. Such consent shall be requested by means of telex or fax specifying loaded and revised ullages and cargo quantities for the tanks concerned and reasons necessitating a cargo transfer. Consent of Charterer shall not be unreasonably withheld and shall be provided expeditiously by telex or cable. Master to confirm to Charterer that operation has been carried out. In the event transfer of cargo is unavoidable to emergency reasons involving risk to vessel's structural integrity or safety of life or for safe navigation, the prior consent of Charterer shall not be required. However, the Master shall inform Charterer of any such circumstances as soon as possible thereafter by telex or fax. In either case, transfer is made at owner's time, risk and expense.

The owner shall not tranship Charterer's cargo without prior agreement from the Charterer. If such permission is given, such transshipment shall be at owner's time, risk and expense and the transshipment vessel's demurrage rate shall apply. In addition, Charterer has the option to load/discharge any portion of this cargo as specified in the Charter Party from/into coastal vessel/barge.

If a nitrogen blanket is required by the Charterer, the Charterer shall supply the initial nitrogen blanket and the owner shall maintain a nitrogen blanket during transit and discharge of Charterer's cargo. The owner shall furnish documented proof that the vessel provided regular and routine nitrogen maintenance as required under this clause. Upon request, a copy of the log shall be supplied to the Charterer.

## 10. Discharge

In case of vessel calling ports in Mid-China area (Nantong, Changshu, Zhangjiagang, Jiangyin, Yizheng, Nanjing, etc.) where Owners call CJK prior to arrival at actual discharge port then Owners only to tender NOR at actual discharge port and NOT CJK.

## 11. Original Bills Of Lading

If not original Bills Of Lading are available upon vessel's arrival at discharging port(s), Owners/Master to discharge the entire cargo against Charterers' Letter Of Indemnity. LOI format as per owners P&I club format.

Owners agents to collect Original Bills Of Lading from Receivers as per the Charterers' discharge instructions.

## 12. Demurrage

Time shall not count as laytime or demurrage if lost:



3

12.1     As a result of a boycott arising in connection with the business of Owner, the terms of conditions of employment of Owner's servants, or employment, trades, or cargoes of the vessel other than under this charter;

12.2     Due to restraint or interference in the vessel's operation by any governmental authority in connection with the ownership, registration, or obligations of the Owner or the vessel, or in connection with stowaways, smuggling or other prohibited activities of the Owner's servants, unless such restraint or interference involved the cargo under this charter, or Charterer itself, or the shipper or receiver of the cargo under this charter;

12.3     Due to cargo contamination or damage caused by unseaworthiness of the vessel or negligence of Owner's servants.

12.4     Due to vessel's failure to have on board a certificate, record, or other document required for trading to the loading and discharge ports;

12.5     Due to vessel's unclean tanks or inability to maintain its warranties, or the need for vessel repairs.

In addition, if as a result of such causes and events the vessel loses its turn to berth, laytime and demurrage shall be suspended until it regains the same berthing position. If such causes or events occur while the vessel is in berth, extra expenses thereby incurred by Charterer in connection with the vessel remaining at the berth shall be for Owner's account and Charterer shall also have the option to order the vessel out of berth, so as to avoid delay to other vessels waiting to use the berth, with the cost of unberthing and reberthing for this purpose to be for Owner's account. Time lost in between berthings shall not count as laytime or demurrage.

If, after disconnection of hoses, vessel remains at berth exclusively for ship's purposes, other than by reasons of force majeure, Owner will responsible for direct of indirect costs charged to Charterer by terminal/suppliers/receivers.

Laytime and demurrage do not begin to run at any port until 6 hours after receipt of notice of readiness, or upon vessel all fast at berth, whichever occurs first.

In the event laytime has expired, Charterer shall be allowed the benefits of Clause 6 and 7 of Part II ASBATANKVOY at each port of loading or discharge before demurrage shall be incurred.

Demurrage claims to be presented within 45 days after completion of discharge and to be filed with properly signed port documents.

Whatever time is saved due to early berthing prior to agreed laycan (date 0001 hours) will be credited to the Charterer should any demurrage occur.

If more than one (1) berth at load or discharge port(s) is allowed under Part IC and/or Part ID, shifting expenses and time between berths to be for Owners account.

Shifting time from anchorage and/or lay-by berth to loading or discharging berth shall not count as used laytime or demurrage, if vessel is on demurrage.

**13. Conoco weather Clause**

13

4

Any delays whether before or after berthing for loading or discharging which are due to weather and/or sea conditions shall count as one half laytime or one half demurrage, if Vessels is already on demurrage.  This Clause to apply whether the berth nominated by Charterer under Clause 9 as per ASBATANKVOY is reachable on arrival or not.

## 14. English Arbitration Law

English Arbitration Law to apply, Arbitration, if any, in Singapore.  LMAA Small Claims Clause to apply.

## 15. ITOPF

Owner warrants that the Vessel is, and throughout the duration of the Charterer will be owned or demise Chartered by, a member of the International Tanker Owner's Pollution Federation Limited.

## 16. H & M

Owner warrants that they have in full force and effect Hull and Machinery insurance placed through reputable brokers on institute time clauses – Hull 1/10/83 – for the value of USD xx,xxx,xxx.xx as per attachment, and such insurance will be maintained throughout the duration of this charter.  Owners to provide confirmation of fully paid insurance cover upon Charterers request.

## 17. Agents

Charterer reserve the right to nominate agent both ends.  If Charterer nominate agent, this agent to be competitive.

## 18. Pro Rating of Cost

Whenever this cargo is one of several cargoes to be loaded or discharged by the vessel at the same port, and vessel is waiting to berth or is diverted on account of risks for which diversion is authorized, then laytime and demurrage shall be apportioned on the basis of the ratio of the tonnage of this cargo to the total tonnage of all such affected cargoes.  All time used in loading or discharge of the other cargoes shall be excluded from laytime and demurrage under this Charter.  Whenever this cargo and other cargo are being loaded or discharged simultaneously, laytime and demurrage during periods of concurrent cargo handling shall be apportioned based on the ratio of the tonnage of this cargo to the total tonnage of all such cargoes subject to concurrent cargo handling.

## 19. Pro Rating of Cost – Additional Premium

Whenever this cargo is one of several cargoes originating in or destined for an "additional premium" war risk zone or an area outside institute warranty limits, or carried via a canal or some other route, or discharged at an authorized diversion port, thereby increasing the sums owed by Charterer Owner under this Charter, each increase shall be apportioned based on the ration of the tonnage of this cargo to the total tonnage of all cargoes subject to the particular dues, extra charges, differentials, or insurance premiums.

## 20. Force Majeure



5

Neither the Vessel nor Master nor Owner, nor the Charterer, shall, unless otherwise expressly provided, be responsible for any loss or damage or delay or failure in performing hereunder arising or resulting from: act of God, act of war, perils of the seas, act of public enemies, pirates or assailing thieves, arrest or restraint of princes, rulers or people, seizure under legal process provided bond is promptly furnished to release the Vessel or of cargo, strike or lockout or stoppage or restraint of labour from whatever cause, either partial or general, riot or civil commotion, fire or explosion or breakdown of Charterer's or its associated company's production plant or of receiver's reception facilities. Neither party shall be responsible for any failure or delay in carrying out a provision of this Charter to the extent that such failure or delay is caused or arises out of circumstances outside the control of such party and not reasonably foreseeable and preventable by it.

## 21. Administration Clause

Charter party terms and conditions shall be evidenced by a written post fixture recap (confirmation) which to be approved by both owner and charterer in writing within 2 working days after the date of receiving such fixture confirmation (post-fixture recap). Unless requested in writing by either owner or charterer there shall be no formal written and signed charter party.

6

Message Printed on 11/08/2005 19:19:37 by GC1          Ref Num:GC2841567
From/To: ("Lawrence Kayablian" <lkayablian@amiragroup.com>)
Case 1:04-cv-... Document 1     Filed 04/17/2007     Page 24 of 30
Date/Time: 18/01/2005 13:06:50
Subject:lkayablian@amiragroup.com

==========================================================================

(WE HEREBY CONFIRM THE RECAP ON OUR CLEAN FIXTURE. PLEASE ARRANGE TO
SEND US CHARTER PARTY AGREEMENT).

You will receive another confirmation from Mauro Guilherme Lopes Benzi
in the morning,
UNIVEN PETROQUIMICA LTDA


Regards,


Lawrence K. Kayablian
Chairman & CEO
The Amira Group International
lkayablian@amiragroup.com
http://www.amiragroup.com/
<file:///C:\Documents%20and%20Settings\Lawrence%20Kayablian\Application%
20Data\Microsoft\Signatures\www.amiragroup.com>

This email message is for the sole use of the intended recipient (s) and
may contain confidential and privileged information.  Any unauthorized
review, use, disclosure or distribution is prohibited.  If you are not
the intended recipient, please contact the sender by reply email and
destroy all copies of the original.




-----Original Message-----
From: brokers@island.com.sg [mailto:brokers@island.com.sg]
Sent: Monday, January 17, 2005 1:53 PM
To: Univen - mauro; Univen - mauro; sriram@fortrec.com; ajay@fortrec.com
Cc: Alexandre@vibrapar.com.br; Univen; tucag@terra.com.br;
jenn@fortrec.com; layhoon@fortrec.com
Subject: clean recap - Mt Bryggen - Santos/WCI


FM: ISLAND SHIPBROKERS (PTE) LTD
     TEL: 65 6536-6466(TANKER), 65 6536-9263(SALE & PURCHASE), 65
6536-6766(OPERATIONS) / FAX : 65 6536-6455 / TELEX : RS 24970

Ref : GC2839848
Date: 1/18/05

Fortrec - Mr Sriram,
Univen - Mr Lawrence
Univen - Mr Mauro


Ref appended message andour telcon with mr Sriram, we are pleased to
recap clean fixture concluded today as folls:-

Charterer : Univen Petroquimica Ltda
Owners    : Bryggen Shipping and Trading
Vessel    : m/t Bryggen, (Ex JO Elm) oos
            (attached q88)

            1st last cgo : refined palm oil
            2nd last cgo : methanol and/or mtbe
            3rd last cgo : ethanol and/or ethyl acetate

For

                              Message Continues...

```
============================================================
 · Message Printed on 11/08/2005 19:19:01  by GC    RefNum:GC2843333
    From:Fo A3Bg4Iaharbrasttrade@baul.on.21       Document 1    Filed 04/17/2007    Page 25 of 30
    Date/Time: 18/01/2005 19:48:21
    Subject:RES: clean recap - Mt Bryggen - Santos/WCI
============================================================
```

Gareth,

We hereby confirm the recap on our clean fixture.
Please arrange to send us the Charter Party Agreement.

Thanks and regards,
Mauro Benzi
Univen Petroquimica
Phone: 55 11 4591 0402
Mobile: 55 11 8245 6784

-----Mensagem original-----
De: brokers@island.com.sg [mailto:brokers@island.com.sg]
Enviada em: segunda-feira, 17 de janeiro de 2005 16:53
Para: Univen - mauro; Univen - mauro; sriram@fortrec.com;
ajay@fortrec.com
Cc: Alexandre@vibrapar.com.br; Univen; tucag@terra.com.br;
jenn@fortrec.com; layhoon@fortrec.com
Assunto: clean recap - Mt Bryggen - Santos/WCI


FM: ISLAND SHIPBROKERS (PTE) LTD
    TEL: 65 6536-6466(TANKER), 65 6536-9263(SALE & PURCHASE), 65
6536-6766(OPERATIONS) / FAX : 65 6536-6455 / TELEX : RS 24970

Ref : GC2839848
Date: 1/18/05

Fortrec - Mr Sriram,
Univen - Mr Lawrence
Univen - Mr Mauro


Ref appended message andour telcon with mr Sriram, we are pleased to
recap clean fixture concluded today as folls:-

Charterer   : Univen Petroquimica Ltda
Owners      : Bryggen Shipping and Trading
Vessel      : m/t Bryggen, (Ex JO Elm) oos
              (attached q88)

              1st last cgo : refined palm oil
              2nd last cgo : methanol and/or mtbe
              3rd last cgo : ethanol and/or ethyl acetate

For

Part cargo : 12000mts lgrd ind ethanol, 5pct moloo
Laycan     : Feb 05-17, 2005
  (2b narrowed to 7 days 7 days prior to comm of l/can)
Loadport   : osp/b Santos, Brazil
Disch port : osp/b Kandla or Mundra or Mumbai, India OR
             osp/b Kandla or Mundra plus Mumbai, India
             (2b declared by 01st feb)
Freight    : USD 75 pmt b/s 1/1
             USD 77 pmt b/s 1/2
- Full freight payable 7 working days after compl of loading
Laytime    : 200/200mtph 1/d shinc rev
Demurrage  : USD19,000.- pdpr
C/P form   : Asbatankvoy with UOPC


- Owner to agree on Switching of Bills of lading if required.
  Switching on B/L to be done in Singapore.
  Chrtr required to surrend full 1st set(s) original B/Ls to exchange

                              Message Continues...



# EXHIBIT 2

## Hans Solberg

| | |
|---|---|
| From: | brokers@island.com.sg |
| Sent: | 30. januar 2005 06:03 |
| To: | All |
| Cc: | POST@BRYGGEN.NO |
| Subject: | Stolt Hawk / univen CD Date 18 Jan 05 |



From: I.S.SHIPBROKERS (PTE) LTD
   Tel: +65 6536-1662   Fax: +65 6536-6455
   EMAIL:BROKERS@ISLANDSHIPBROKERS.COM
   Ref:GC2667628
   Date:1/30/05


Bjorn / Gareth


We have received below confirmation from Mr Lawrence Kayabian.

Ref below, kindly proceed to find replacement cargo for stolt hawk.
We shall await for yr good news.


QT

From: "Lawrence Kayabian" <lkayabian@amiragroup.com>
To: <brokers@island.com.sg>
cc: <mauro.benzi@univenpetroleo.com.br>, <mauro@fastirade.com.br>,
     "Sriram" <sriram@fortrec.com>,
     "Alexandre Argoud Malavazzi" <alexandre@vibrapar.com.br>,
     Subject: Ship
Date: Sat, 29 Jan 2005 21:10:06 -0500


On behalf of Univen, I have been advised by them to inform you of the
message below.

Re : Ethanol 12000mt  Santos / WC India L/can 05-17 Feb
   C/P dated 18 Jan 2005

We, Univen Petroquimica Ltda, hereby confirm that we will not be
shipping the above mentioned cargo on Stolt Hawk and please advise
owners to find replacement cargo.



Regards,




Lawrence K. Kayabian
Chairman & CEO
The Amira Group International


UNQT


//////

On a seperate e-mail we received from him

1



QT

I have spoken to them but they don't have access to email tonight so I
have written the email on there behalf. I will send you a confirmation
from them tomorrow morning Sao Paulo time.

Regards,

Lawrence K. Kayabian
Chairman & CEO
The Amira Group International

Unqt

Brgds
Gareth
I.S. Shipbrokers

CC: Bryggen Shipping and Trading - Capt Bjorn Landoy

12.2

2

19

# EXHIBIT 3

16



**SHIPPING &
TRADING A/S**

Address:
Gullaksagaarden, Bryggen 47
5003 Bergen, Norway

BERGEN, 01.02.2005

Univen Petroquimica Ltda
C/O LS, Shipbrokers (Pte) Ltd

Deadfreight             **INVOICE   NO Nr.   04391**

### RE: M/T "STOLT HAWK" - C/P 17.01.2005 – UNIVEN

| | |
|---|---|
| 12.000 mts + 5% more = 12.600 mts at USD 75,- pmt | = USD 945.000,00 |
| Demurrage rate is USD 19.000,- pdpr x 2 days | = USD  38.000,00 |
| | |
| Deadfreight less saved sailing | = USD 907.000,00 |
| | |
| Less Santos port call | = USD  25.000,00 |
| Less 1 port WC India | = USD  18.000,00 |
| | |
| Net due after saved port cost | = USD 864.000,00 |
| | |
| Less saved laytime 1250 mt/ 200 mtph equals | |
| 63 hours each port, based on demurrage rate | = USD  99.750,00 |
| | |
| Leaves applicable deadfreight of | = USD 764.250,00 |

Please remit to:

Union Bank of Norway (Gjensidige NOR Sparebank)
USD ACCOUNT: 6210.05.33215
IBAN: NO85 62100533215
Swift: UBNONOKK
Credit: Bryggen Shipping & Trading A/S
Gullaksagaarden, Bryggen 47
N-5003 Bergen, Norway
Corresponding Bank:
Bank America International,
335 Madison Avenue, New York, N.Y. 10017
A.B.A. No: 026-009-593
Swift: BOFAUS3N

V.A.T. No.: 842340772

20